# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| WILLIAM ADAMS a/k/a | ) | |
| GORDON KEITH, ELVY WOODARD, | ) | |
| GORDON HAGEN and STEELTOWN | ) | |
| RECORDS, INC., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|        v. | ) | No.: 2:97-CV-141 PS |
| | ) | |
| MICHAEL JACKSON, TITO JACKSON, | ) | |
| MARLON JACKSON, JACKIE JACKSON, | ) | |
| JERMAINE JACKSON, THE JACKSON FIVE, | ) | |
| BRUNSWICK RECORD CORPORATION, and | ) | |
| BEN BROWN, | ) | |
|     Defendants. | ) | |

## <u>MEMORANDUM, OPINION AND ORDER</u>

This case arises from the production and release of the compact disc *The Jackson Five Pre-History: The Lost Steeltown Recordings* ("the Album"). As the title suggests, the Album purported to be songs performed by the Jackson Five during their formative years in Gary, Indiana. Defendant Michael Jackson is a well known recording artist who, along with his brothers Tito, Marlon, Jackie and Jermaine, performed as the Jackson Five in the late 1960s and early 1970s. Although all of the Jackson brothers and the Jackson Five as an entity have been sued in this matter, Michael Jackson is the only Jackson to have been served. (Michael Jackson is referred to hereinafter as "Jackson," unless clarity requires otherwise).

The Album was produced by Defendant Ben Brown and was released by Defendant Brunswick Record Corporation ("Brunswick"). The problem arose when Brunswick included two songs on the Album – "Let Me Carry Your School Books" and "I Never Had a Girl" – that were not performed or written by any member of the Jackson family. In fact, Plaintiffs William

Adams and Elvy Woodard are the registered owners of the copyright for those two songs and Plaintiff Gordon Hagen performed on the two songs.  Adams alleges that "Let Me Carry Your School Books" and "I Never Had a Girl" were included on the Album without his permission, without a proper license, and were passed off by Defendant Jackson as early "Jackson Five" recordings.

Michael Jackson has moved for summary judgment [Doc. 189][1], arguing that he did not authorize or have any involvement with the production or release of the Album and that Adams has submitted no evidence to support his allegations against him.  For the reasons stated below, Defendant Jackson's Motion for Summary Judgment is granted.[2]

## FACTUAL BACKGROUND

### Creation and Production of the Album

Defendant Michael Jackson and his brothers hail from Gary, Indiana, and although they went on to become internationally known recording artists (especially Michael), in the late 1960s they were just another local singing group trying to make good when they caught the eye of Defendant Ben Brown.  Brown was the President of Steeltown Records, Inc., and in 1967, he signed the Jackson brothers to the Steeltown label.  Although the relationship was short lived

---

[1]  Jackson moved for the entry of summary judgment against all Plaintiffs.  Plaintiff Steeltown Records Inc. failed to file a response to Jackson's motion.  For the reasons stated within the balance of this opinion, we find that Jackson is entitled to summary judgment against Steeltown Records, Inc.

[2]  Since the filing of Jackson's Motion, a settlement agreement has been reached between Jackson and Plaintiffs Elvy Woodard and Gordon Hagen.  [*See* Doc. 239]  Therefore, this opinion will address the remaining claims and arguments raised by Plaintiff William Adams.  Jackson's outstanding Motion in Limine to Bar Plaintiff's Copyright Act Claim Due to Lack of Standing [Doc. 138] will not be addressed because it is rendered moot by this order.

because the Jacksons signed with the well-known Motown label a short while later, the Jacksons were affiliated with Steeltown Records long enough to record at least ten songs.

In an effort to capitalize on these "lost" recordings of the now famous Jackson brothers, Brown sought to market the songs in the mid-1990s, some 25 years after they were recorded.  To that end, in 1994, Brown entered into a contract with Inverted Records and Productions, Inc. ("Inverted") granting the exclusive license to eleven master recordings of the Jackson Five while they were signed to the Steeltown label in the late 1960s.  (*See* Defendant's Ex. A.)  These eleven songs formed the basis for the Album.

On March 28, 1996, the contract was amended and Brown purported to license to Inverted (who then licensed them to Brunswick) the two allegedly infringing songs -- "Let Me Carry Your School Books" and "I Never Had a Girl."  The addendum to the contract provides that these two songs were performed by a group known as the Ripples and Waves plus Michael and that they were Steeltown Records recordings.  (*Id.* at Ex. B.)  Things got messy, however, when Brunswick added these two songs to the Album and released it to the public.  Thus, the Album was promoted as fourteen "lost" Jackson Five recordings but in reality only twelve of the fourteen songs were performed by the Jackson Five; the other two were performed by the Ripples & Waves Plus Michael.

To be sure, there exists real confusion in the music industry over whether the Jackson Five went by the name Ripples & Waves in their early days.  The confusion almost certainly derives from the fact that the "Ripples & Waves" also performed as the "Ripples & Waves Plus Michael" for about six months in 1971.  But "Michael" in the Ripples & Waves Plus Michael is actually Michael Rogers, not Michael Jackson.  Elvy Woodard testified that he believes the

misconception that Ripples & Waves Plus Michael were actually Michael Jackson and the Jackson Five started in 1987 with the publication of a book. (Woodard Dep. at 196.) Morever, there are several publications, including unauthorized biographies of Michael Jackson and internet sites, that have propagated this misunderstanding with claims that the Jackson Five were at one time known as Ripples & Waves Plus Michael. Another compact disc recently released named *Jackson 5, The Ultimate Selection* contains liner notes stating that the Jackson Five was formerly Ripples & Waves Plus Michael. (*Id.* at 171.) Even the Rock and Roll Hall of Fame refers to Ripples & Waves Plus Michael as an early name used by the Jackson Five. (*Id.* at 173); *see also* http://www.rockhall.com/hof/inductee – The Jackson Five. Each of these is erroneous.

In any event, Ben Brown testified that Steeltown Records – in addition to having an agreement with the Jackson Five – also had a recording agreement with the Ripples & Waves Plus Michael and that Steeltown produced the two songs at issue. (*See* Brown Dep. at 19, 41.). Thus, Brown claims that he had the right to license those two songs to Inverted (who later licensed them to Brunswick). By contrast, Plaintiff Adams claims that Ripples & Waves was never signed as a group to the Steeltown label. (Adams Apr. 2003 Aff. ¶ 6.) Instead, Adams contends that Steeltown Records merely manufactured 500 copies of the two songs so that Adams could shop the group around in an effort to get them a record deal. (*Id.*) As a result, Adams claims that the songs "Let Me Carry Your School Books" and "I Never Had a Girl" were not created under the authority of Steeltown Records and the master recordings are not and never

were owned by Steeltown Records.  (*Id.* ¶ 7.)  Indeed, Adams and his nephew Elvy Woodard are the registered copyright owners for both musical compositions.[3]

On April 8, 1996, Inverted entered into an agreement with Defendant Brunswick to distribute the Album.  (*Id.* at Ex. C.)  This agreement specifically states that:

> [Inverted] has made <u>no</u> representation that either of the two above song titles ["Let Me Carry Your School Books" and "I Never Had a Girl,"] or the sound recordings thereof which are the subject of this license agreement, feature the performances of the Jackson Five or Michael Jackson, or that the recording group Ripples and Waves consisted of any member(s) of the Jackson Five.  [Inverted] shall incur no liability, and shall be fully indemnified by Brunswick, for any statements or representations made by Brunswick contrary to the preceeding [*sic*] sentence.

(*Id.*).

As early as August 1994, Jackson's counsel sent cease and desist correspondence to Defendant Brown upon learning of Brown's plans to produce and distribute the Album.  (*Id.* at Ex. D.)  Jackson's attorney, Brian Wolf, repeatedly advised Brown that Jackson objected to "the use of his name, image, likeness or voice to commercially advertise and sell the "Steeltown Masters" or any other product and was investigating whether the sale of the "Steeltown Masters" constituted copyright infringement.  (*Id.*)

The Plaintiff has provided the Amended Affidavit of Ivan Woodard, a former member of Ripples & Waves, in response to Jackson's motion for summary judgment.[4]  Woodard claims

---

[3]  The application for copyright registration for "I Never Had a Girl" also includes a third individual, Ronald Bills, who allegedly sang lead on the song.  (*See* Adams Feb. 2002 Aff. ¶ 29.) It is unclear whether he also is a copyright owner.

[4]  Ivan Woodard was previously a Plaintiff in this lawsuit but voluntarily dismissed his claims.  Defendant Jackson argues that the Amended Affidavit should be stricken for a number of reasons.  While the Court finds Jackson's motion to strike well-founded, the Amended

that in 1996 he received a telephone call from Ben Brown, Jackie Jackson, and Tito Jackson.

Specifically, Ivan Woodard maintains that he was told during the phone call that Brown and the

***Jackson Five*** had created the Album and that it included "Let Me Carry Your School Books"

and "I Never Had a Girl."  (Woodard Am. Aff. ¶ 2.) (emphasis supplied.)  Brown allegedly told

Woodard that because "they had no rights to the songs they wanted to try and compensate the

*Ripples and Waves* for the use of their songs."  (*Id.* ¶ 3.)  Woodard directed them to Adams and

to his brother Elvy Woodard, because he (Ivan Woodard) did not have any rights to the two

songs at issue.

**Release of the Album**

On June 4, 1996, the Album was released.  Shortly after release of the Album, Adams

contacted Brown because he was shocked to find out that Ripples & Waves material was on the

Album, that the Album was released prior to obtaining his authorization, and that he was not

given producer credits.  (Adams Apr. 2003 Aff. ¶¶ 14-15.)

On June 26, 1996, Adams and Brown entered into an agreement that provided that

Adams would grant Brown a ten year exclusive license to "the Master Recordings and other

creative assets created under the authority of Steeltown, Inc., including its interest in recordings

by Michael Jackson and The Jackson Five."  The Agreement also provided that "GORDON

KEITH will be listed on all packaging as the "Producer."  Adams maintains that the Agreement

was intended to deal only with the Jackson Five songs, and that the two Ripples & Waves songs

were not included.  (*Id.* ¶¶ 20-22.)  After the signing of the Agreement, nothing was done to

---

Affidavit will not be stricken.  Plaintiff did not make any misrepresentation to the Court when he
sought leave to file the Amended Affidavit and Defendant Jackson was not prejudiced by the
amendment made only three days after the original Affidavit was filed.

remove the Ripples & Waves songs from the Album or to give William Adams (a.k.a Gordon Keith) producer credits.  (*Id.* ¶ 23.)  Almost a year later, Adams informed Brown that he was revoking the Agreement and filed this lawsuit.  (*Id.*)

Immediately after hearing of the lawsuit, on July 9, 1997, Michael Jackson's attorneys sent additional correspondence to Brown again indicating that Jackson had no involvement with the Album in question, did not benefit from it, and demanding that Brown inform Plaintiff's counsel of this fact.  (Defendant's Ex. D.)  In response, Brown contacted Plaintiff's original counsel and asserted that Jackson had nothing to do with the Album.  (*Id.*)  Jackson's attorney also contacted Plaintiff's original counsel requesting a voluntary dismissal.  (*Id.*)  As a result, Jackson was dismissed from this lawsuit in October 1997.  (Defendant's Ex. F.)  However, over four years later, on October 30, 2001, Plaintiff's new counsel reinstated the Complaint against Jackson.  (Defendant's Ex. G.)

**Deposition Testimony Regarding**
**Michael Jackson's Involvement With the Album**

On June 10, 2003, Jackson testified at his deposition.  Specifically, and most importantly, Jackson testified that he had no involvement with the group Ripples & Waves Plus Michael nor did he have any involvement in any aspect of the allegedly infringing Album.  (Jackson Dep. at 81, 102, 104.)

In addition to Defendant Jackson's own testimony, Defendant Brown testified that Jackson had no affiliation with the allegedly infringing Album.  (Brown Dep. at 30.)  Brown testified that Jackson did not have any involvement in the production, manufacture or distribution of the allegedly infringing Album.  (*Id.*)  Brown further testified under oath that

Jackson's attorney explicitly asked him not to use his name or likeness in connection with the Album.  (*Id.*)

Paul Tarnopol, the President of Brunswick, the company that distributed the allegedly infringing Album, also submitted a sworn affidavit wherein he stated that Jackson had no involvement with Brunswick or in the production or release of the Album and that Jackson never entered into any business arrangements with Brunswick for the manufacture, distribution or sale of the Album.  (Tarnopol Aff. ¶¶ 3-8.)

Finally, Jackson's own attorney, Brian Wolf, also testified and further corroborated Jackson's testimony.  Wolf testified that Jackson had no involvement with the allegedly infringing Album and received no money as a result of its distribution.  (Wolf Dep. at 30.)

Plaintiffs have failed to submit any evidence that contradicts any of the testimony outlined above regarding Jackson's involvement – or more appropriately, lack thereof –  in the creation, production, and release of the allegedly infringing Album.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must look at the evidence "as a jury might, construing [the] record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true."  *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003).  The Court's "function is not to weigh the evidence but merely to determine if 'there is a genuine issue for trial.'"  *Bennett v. Roberts,* 295 F.3d 687, 694 (7th Cir. 2002) (citation

omitted).  Summary judgment must be entered "against a party who fails to make a showing
sufficient to establish the existence of an element essential to that party's case, and on which that
party will bear the burden at trial." *Tatalovich v. City of Superior,* 904 F.2d 1135, 1139 (7th Cir.
1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)).

## I.      Copyright Infringement

Plaintiff alleges that Jackson individually and as a member the Jackson Five, violated the
Copyright Act by publishing and placing on the Album two allegedly infringing songs without
first obtaining the Plaintiff's permission.  (*See* Plaintiff's Response at 7.)  Defendant Jackson
argues that Plaintiff has failed to provide any evidence that he violated their exclusive rights to
the songs by copying his work or that he even had access to his songs.  (Defendant's Mem. at
11.)  Furthermore, Jackson contends that he cannot be liable for the alleged acts of his brothers
because the Jackson Five is not, and never was a partnership.  (Defendant's Reply at 9-11.)

Two elements are necessary to establish a *prima facie* case of copyright infringement:
ownership of a valid copyright, and copying by the alleged infringer.  *I.A.E., Inc. v. Shaver,* 74
F.3d 768, 774 (7th Cir.1996).  "Proof of copying is crucial to any claim of copyright
infringement … if the defendant did not copy the accused work, there is no infringement." *Selle
v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984); *Runstadler Studios, Inc. v. MCM Ltd. P'ship*, 768 F.
Supp. 1292, 1294 (N.D. Ill. 1991) (to prevail a plaintiff must show that the defendant "copied"
its work).  In this case, the only element at issue is proof of copying.

Because direct evidence of copying is rarely available, the plaintiff can rely upon
circumstantial evidence to prove this essential element.  *Selle*, 741 F.2d at 901.  The most
important component of this sort of circumstantial evidence is proof of access to the allegedly

infringed musical composition. *Id.*; *see generall*y 3 Nimmer, Copyright § 13.02 at 13-9

(Matthew Bender & Co. 2003).  Defendant Jackson maintains that there is no evidence that he

copied the Plaintiff's musical compositions or that he even had access to the songs.

Plaintiff maintains that Jackson is liable under two theories.  First, because his likeness

appears on the cover to the Album, Plaintiff claims that this is evidence that Jackson was

involved in the copying of the two songs.  Second, that as a member of the Jackson Five,

Plaintiff argues that Jackson is vicariously liable for the acts of his brothers Tito and Jackie.

Neither argument is persuasive.

### A.  Jackson's Likeness on the Album

Plaintiff argues that because the Jackson Five's name and likeness appear on the Album

and its packaging that this is evidence of Jackson's "approval, ownership, control of production"

of the Album creating a genuine issue for trial.  Plaintiff misses the point entirely.

Citing only to a general evidence hornbook, Plaintiff attempts to make an analogy

between the inclusion of Jackson's picture (as a member of the Jackson Five) on the cover of the

Album as evidence that he approved of and was involved in the copying of Plaintiff's songs with

that of the "name or number marked on a ship, a railroad car, or other chattel or structure" which

may be admissible evidence to show "that person's ownership or control" of the chattel for

proving legal responsibility on a theory of negligence.  (Plaintiff's Response at 5-6, citing John

H. Wigmore, Evidence in Trials at Common Law §§ 150a, 2510a (Little, Brown & Co. 1981)).

This analogy is flawed in a number of respects.

Jackson's likeness is not similar to a license plate tag or a brand mark on cattle.  *See*

Wigmore at § 2510a.  Thus, evidence that may be admissible to prove ownership and agency of a

vehicle or cattle in a negligence action is not evidence admissible to show that an individual "copied" a work in a copyright infringement action. One simply has nothing to do with the other. The fact that Jackson's likeness appears on the Album does not make it more or less likely that he copied the two songs at issue, nor is it evidence that he had access to the songs. Jackson is a celebrity figure whose photographic likeness is readily available for individuals to use and copy without his consent or knowledge. The use of an old photograph of the Jackson Five, that included Jackson, is not evidence of Jackson's approval or involvement in the Album. In fact, all of the admissible evidence is to the contrary.

Jackson has provided the correspondence between his attorney Brian Wolf and numerous individuals, including Defendant Brown, providing that Jackson objected to "the use of his name, image, likeness or voice to commercially advertise and sell the "Steeltown Masters" or any other product. (Defendant's Ex. D.) Plaintiff does not dispute that Jackson's counsel sent numerous letters to Brown and others in an attempt to stop the use of his likeness in conjunction with the Album. Thus, there is no evidence that Jackson, in his individual capacity, had anything to do with the copying of the Plaintiff's songs.

**B.    The Alleged Jackson Five Partnership**

Recognizing that Jackson had absolutely no direct involvement in the copying of the two songs, Plaintiff tries to hook him into this case on a theory of vicarious liability. In particular, Plaintiff contends that Michael Jackson is vicariously liable because his brothers Tito and Jackie allegedly were involved in a phone call where Ivan Woodard was told that the Jackson Five were involved in making the Album. Plaintiff's theory is based on the assumption that the Jackson Five is partnership and that Jackson is liable for the acts of his "partners" Jackie and Tito. First,

11

we will address the threshold issue of whether the Jackson Five is a partnership.  Second, vicarious liability in copyright infringement will be discussed.

### 1.  Proof of the Partnership

Plaintiff Adams contends that he "pleaded facts sufficient enough to establish that The Jackson Five operated as a partnership."  (Plaintiff's Response at 7.)  In reality, Plaintiff did not plead that the Jackson Five was a partnership nor did he plead facts sufficient to establish a partnership.  Most likely, this is because this theory of liability against Jackson was developed after the fact.  However, it does not matter because, even assuming that Adams properly pled that the Jackson Five was a partnership, he has not come forward with sufficient evidence to establish the existence of a partnership.

Adams asserts that because the Jackson Five is "a world renowned singing group" a "partnership agreement is clearly implied" through the Jackson Five group performances, group appearances, and through their sharing of profits.  (Plaintiff's Response at 9.)  Apart from this bare assertion, Plaintiff points only to the deposition testimony of Defendant Jackson to support his partnership theory.

When Jackson was asked whether he was "entitled to royalties on any Motown project that involve[d] either Michael Jackson or the Jackson Five," Jackson responded "I'm not sure." (Jackson Dep. at 172-73.)  After an objection was raised by Jackson's counsel and he was asked the same question again, he stated "yes."  (*Id.* at 173.)  This one line snippet from Jackson's deposition does not defeat summary judgment because the Court cannot possibly know that Jackson would only be entitled to royalties as the result of a partnership agreement.  Such a conclusion is nothing more than speculation.

12

Adams has had almost seven years to establish his theory of the case and come forward with evidence to support it.  The Seventh Circuit has noted that summary judgment is the "put up or shut up" moment in a lawsuit, when a party "must show" what evidence it has that would convince a trier of fact to accept its version of events.  *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999).  The Plaintiff could have sought the Jackson Five's recording agreement with Motown through discovery requests to establish how the royalties from Jackson Five recordings are distributed.  But, no recording agreement has been produced.  The Plaintiff could have asked Jackson through requests for admissions or interrogatories whether the Jackson Five is or was a partnership.  At the very least, the Plaintiff could have asked Jackson these very questions during his deposition.  The Plaintiff failed to take any of these steps to obtain the admissible evidence necessary to prove up his partnership theory.

To be clear, it is the Plaintiff's burden to come forward with admissible evidence to prove up his theory of the case, it is not the Court's responsibility to take the Plaintiff's theory and figure out if there exists any evidence to support it.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 899 (7th Cir. 2003) ("We have repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them").  Because the Court has no Motown recording agreement, we cannot possibly know how the royalties from those recordings are to be distributed to the members of the Jackson Five, and specifically to Jackson.  Simply because Jackson may or may not be entitled to any potential royalties for songs he performed as a child member of the Jackson Five does not prove that a partnership existed between the Jackson brothers such that Jackson

13

may be vicariously liable, some twenty years later for the alleged actions of his brothers Tito and Jackie Jackson, especially where he disavowed any involvement in the project.

Moreover, the Plaintiff has pointed to no case law, whether state or federal, which indicates that members of a band are considered to be members of a partnership based solely on their membership in the band. On the contrary, a Louisiana Court of Appeals held that a band, organized similarly to the Jackson Five, was an unincorporated association, not a partnership. *See Boogie Kings v. Guillory*, 188 So.2d 445, 448 (La. Ct. App. 1966). The Court has located numerous cases throughout the country that address the legal ramifications of formal written partnership agreements involving bands, but Plaintiff has provided no evidence that any such partnership agreement ever existed between members of the Jackson Five. *See e.g.*, *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487 (9th Cir. 2000); *Hanlin v. Mithelson*, 794 F.2d 834 (2d Cir. 1986); *Gianni Sport Ltd. v. Metallica*, No. 00Civ. 0937(MBM), 2000 WL 1773511 (S.D.N.Y. Dec. 4, 2000).

In short, the Jackson Five at one time may have been a partnership, a corporation, an unincorporated association, or a collection of sole proprietorships; we simply do not know. We do not even know if the Jackson Five existed as an entity at the time of the creation of the Album. If the Jackson Five were ever a partnership, the partnership may have been dissolved decades ago. The record is devoid of any evidence that addresses any of these concerns. Absent some evidence of a partnership agreement, one cannot make the assumption that the Jackson Five were or are a partnership simply because they were a band that performed together and Jackson may be entitled to royalties from their recordings. Thus, any claim that Jackson is liable

14

for the acts of his "partners" – his brothers Tito and Jackie – fails because there is no proof that they were partners to begin with.

### 2. Vicarious Liability

Even assuming that Plaintiff had sufficient evidence that the Jackson Five was at one time a partnership, based on the current record, Jackson would not be held vicariously liable for the acts of Tito and Jackie Jackson.  While it is true that liability for copyright infringement may be either direct or vicarious, one may be liable as a vicarious infringer only if he has "the right and ability to supervise infringing activity and also has direct financial interest in such activities."  *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see also In re: Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 654 (N.D. Ill. 2002).  Such a situation generally exists where there is a partnership or agency relationship. *See e.g.*, *Sailor Music v. IML Corp.*, 867 F. Supp. 565, 569 (E.D. Mich. 1994) (partner of primary infringer liable because he "derived financial benefits" from the infringement and as a "general manager" was responsible for the policy of neglect which resulted in the infringement). Adams urges us to find such a relationship here, but all of the evidence is to the contrary.

It is undisputed that Jackson derived no financial benefit from the Album.  Jackson testified that he did not select or approve the songs on the Album, and he did not receive any royalties from the Album.  (Jackson Dep. at 101-02.)  Defendant Brown, Brian Wolf, and Paul Tarnopol all corroborated Jackson's testimony.  (*See* Brown Dep. at 26, 30, 42; Wolf Dep. at 29-31; Tarnopol Aff. ¶¶ 3-7.)

If Jackson were a partner in the Jackson Five "partnership" which allegedly created the Album with Ben Brown (*see* Woodard Am. Aff.), it would follow that Jackson would have had the ability to supervise the creation and manufacture of the Album and that he would have a direct financial interest in the Album.  Neither happened here.  Instead, Jackson, through his counsel, repeatedly urged Brown not to go forward with the creation of the Album and after the release of the Album sent correspondence to Brown stating, "Michael Jackson had no knowledge of the Release, nor did he ever approve of, sanction, authorize or participate in the Release, nor has he participated in or received any royalties or other payment or compensation in connection with the Release." (*See* Defendant's Ex. D.)  On this evidence, Jackson cannot be found vicariously liable for the alleged copyright infringement of other members of the Jackson Five.

 In sum, Adams has failed to show that the Jackson Five were a partnership when they performed together as a band in the late sixties and early seventies[5] and in 1996 when the Album was produced and released.  Accordingly, because the Plaintiff Adams has failed to show that Jackson copied his works, or that he is vicariously liable, Jackson is entitled to summary judgment on Plaintiff's copyright infringement claim.

## II.    Lanham Trade-Mark Act Violation

Plaintiff also brings a "reverse passing off" claim[6]  against Jackson, alleging that he attempted to pass off the Ripples & Waves Plus Michael songs as Jackson Five songs on the

---

[5] Michael Jackson, who in the late 1960s was no more than ten years old and in the eyes of the law an infant, could not have entered into a binding partnership contract.

[6] "Reverse passing off" occurs "when a person removes or obliterates the original trademark, without authorization, before reselling goods produced by someone else." *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1202, n.1 (7th Cir. 1990) (citations omitted).

Album and placed the Album into the stream of commerce in violation of the Lanham Act.

Defendant Jackson counters that there is no evidence to substantiate the allegations and that

Plaintiff is unable to establish any of the elements of his Lanham Act claim.

Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125, provides in part:

> Any person who, or in connection with any goods or services, or
> any container for goods, uses in commerce any word, term, name,
> symbol or device, or any combination thereof, of any false
> designation of origin, false or misleading description of fact, or
> false or misleading representation of fact, which –
>
> (A)  is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection or association of such person with
> another person, or as to the origin, sponsorship, or approval of his
> or her goods, services, or commercial activities by another person,
> …
>
> * * * *
>
> Shall be liable in a civil action by any person who believes that he
> or she is likely to be damaged by such act.

15 U.S.C. § 1125.  To establish a *prima facie* false designation of origin claim under the Lanham

Act, a plaintiff must establish that: (1) defendants used a false designation of origin or false

description or representation in connection with goods or services; (2) defendants caused such

goods or services to enter into commerce; and (3) plaintiff believes it will be damaged as a

result.  *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990).

Plaintiff cannot establish the first two elements of his Lanham Act claim.

As described above in detail, Jackson has testified that he had no involvement in the

production or release of the Album, that he did not select or approve of the songs on the Album,

that he did not receive any royalties from the Album, and that he specifically directed Defendant

Brown not to use his name, likeness or persona in connection with the Album.  (*See generally*

Jackson Dep.)  Brown, Brian Wolf, and Paul Tarnopol corroborated Jackson's testimony.

17

Because there is no evidence that Jackson was involved in any way with the Album, it follows that Jackson did not attempt to pass off the Ripples & Waves Plus Michael's songs as Jackson Five songs, and did not place the Album into the stream of commerce.  Plaintiff cannot maintain a Lanham Act claim against Jackson.

Adams attempts to rely on cases where a plaintiff celebrity has filed suit against a defendant for the unauthorized use of his photo or likeness for commercial gain to support his trademark infringement claim.  *See Jackson v. MPI Home Video*, 694 F. Supp. 483 (N.D. Ill. 1988); *Allen v. Nat'l Video Inc.*, 610 F. Supp. 612 (S.D.N.Y 1995).  These cases are clearly distinguishable from the one before the Court.  In these cases, the *celebrity* contends that the public may be confused and believe that he has endorsed or sponsored the defendant's product because of the use of the *celebrity's* name and likeness, when in reality the celebrity had nothing to do with it.  Plaintiff wants the Court to stand the *Jackson* and *Allen* holdings on their heads to support his proposition that Defendant Jackson was involved and approved of the Album because someone inappropriately used a Jackson Five photo that included him – even though there is no evidence that Defendant Jackson had anything to do with the Album.[7]  If we adopted Plaintiff's theory, Jackson, as well as any other celebrity, could be sued under the Lanham Act every time another person inappropriately used an image of the celebrity without his or her permission.  We refuse to do so.

---

[7] Defendant Jackson might have a Section 43(a) Lanham Act (15 U.S.C. § 1125(a)) claim as a result of the inclusion of the Jackson Five photo and the resulting false implied representation that Jackson authorized or approved the Album.  *See Jackson*, 694 F. Supp. at 492 (Jesse Jackson had a Section 43(a) Lanham Act claim where an unauthorized photo of Jackson appeared on a videotape cassette selling a copy of his speech at the 1988 Democratic National Convention).

Finally, Jackson cannot be found jointly and severally liable for the actions allegedly taken by his brothers or the Jackson Five because the Plaintiff has no evidence that the Jackson Five is or ever was a partnership.  Because trademark infringement is tortious, the doctrine of joint tortfeasors applies.  *David Berg & Co. v. Gatto Int'l Trading Co., Inc.*, 884 F.2d 306, 311 (7th Cir. 1989).  However, in a case like this one where there is no evidence that supports the existence of a partnership, joint tortfeasor liability is precluded.  *Id.* (finding joint tortfeasor liability is precluded where there is (1) no evidence of a partnership agreement, (2) no evidence that the alleged partners held themselves out to the public or operated as a partnership, (3) no evidence that one partner had authority to bind the other in any transaction with any third party, or (4) no evidence that the partners exercised joint ownership of, or control over, the allegedly infringing product).  Therefore, Defendant Jackson is entitled to summary judgment on the Plaintiff's Lanham Act claims.

## III.    Civil Conspiracy

The Plaintiff alleges in his Complaint that: "Defendants and each of them conspired together to engage in the misconduct and to accomplish the unlawful and deceitful effects, injury and damages described above, and they did all of those things as hereinabove alleged which they conspired to do."  (Compl. ¶ 28.)

The mere allegation of conspiracy is insufficient to support a claim for civil conspiracy. *Sanderson v. Brugman*, No. IP 00-0459-C H/K, 2002 WL 31255470 (S.D. Ind. Sept. 20, 2002). To meet his burden of proof, Plaintiff needs to bring forth evidence that a conspiracy existed.  A plaintiff's conclusory allegation of conspiracy fails to establish any civil conspiracy.  *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859-60 (7th Cir. 1999).  A civil conspiracy is "a

combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." *Clark v. Integrity Fin. Group, Inc.*, No. TH 00-028-C-T/H, 2002 WL 1821771 at *8 (S.D. Ind. June 25, 2002) (citation omitted).

Adams relies solely on the Amended Affidavit of Ivan Woodard to support his civil conspiracy claim. Adams argues that Woodard's testimony – that during a telephone conference with Brown, Tito Jackson, and Jackie Jackson he was told that "Mr. Brown and the Jackson Five had created a new Jackson Five CD called *The Jackson 5-Pre-History: The Lost Steeltown Recordings*" – establishes a conspiracy that includes Michael Jackson. (Woodard Am. Aff. ¶ 2.) Because we have already found that there is no evidence that the Jackson Five was a partnership, and because Woodard's Amended Affidavit does not concern or even mention any actions of Michael Jackson individually, Plaintiff cannot establish a civil conspiracy claim against Defendant Jackson on this evidence alone. There is no evidence that there was some concerted action between Michael Jackson and other Defendants in connection with the production, release, and sale of the allegedly infringing Album. All of the evidence is to the contrary; Jackson wanted nothing to do with the project and repeatedly said so in letters from his lawyer. Thus, Plaintiff's civil conspiracy claim against Defendant Jackson fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant Michael Jackson's Motion for Summary Judgment [Doc. 189] is hereby **GRANTED**; the clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant Michael Jackson stating that Plaintiff William Adams and Plaintiff Steeltown Records, Inc. are entitled to no relief. For the reasons expressed in this Opinion, Defendant Michael Jackson's Motion in Limine [Doc. 138] and Motion to Strike are hereby **DENIED AS MOOT**.

      **SO ORDERED**.


ENTERED: February 23, 2004


                          s/ Philip P. Simon
                          PHILIP P. SIMON, JUDGE
                          UNITED STATES DISTRICT COURT